UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF CONNECTICUT

| | |
|---|---|
| WENDELL HASAN, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) 3:11-CV-524 (GWC) |
| | ) |
| WARDEN JOHN ALVES, | ) |
| | ) |
| Respondent. | ) |

**OPINION AND ORDER RE:
RESPONDENT'S MOTION TO DISMISS
(Doc. 11)**

This is a claim for post-conviction relief filed pursuant to 28 U.S.C. § 2254. The case arises out of the state prosecution and conviction of petitioner Wendell Hasan on charges of felony murder and burglary in 1986. He is currently serving a sentence of 80 years. The application for a writ of habeas corpus before this court challenges the constitutionality of a search warrant permitting a search of his home in July of 1985.

Because the federal petition was not filed until 2011, the State has filed a motion to dismiss on grounds of time-bar. Mr. Hasan has raised a claim of equitable tolling to excuse his delay in filing the petition. This court previously ruled that the equitable tolling issue required an evidentiary hearing. This hearing occurred on February 17, 2016, and this decision is based in large part on the evidence provided at the hearing. Before reaching the issue of equitable tolling, however, it is necessary to review the history of the case from the beginning.

**I.     Background**

**A.     The Trial**

The facts giving rise to Mr. Hasan's prosecution were considered on direct appeal to the Connecticut Supreme Court. The following summary is drawn from that court's decision. *See State v. Hasan*, 205 Conn. 485 (1987).

1

On July 2, 1985, police responded to the home of George and Rachel Tyler in Darien, Connecticut. They found Mr. Tyler dead in the kitchen. Mrs. Tyler was injured. The house had been burglarized. Police investigators found a bloody footprint made by a sneaker.

Three days later, a plumber clearing a clogged toilet in an apartment in South Norwalk discovered two credit cards in the name of George Tyler. The apartment was the home of Mr. Hasan, his mother, stepfather, brother, two sisters, and brother's girlfriend. The police conducted a search pursuant to a warrant. They found a bloody Puma sneaker in one of the bedrooms. Following his arrest, Mr. Hasan told the police that he lived at the apartment and owned a pair of Puma sneakers like those seized.

The evidence at trial included comparison of glass shards and linoleum taken from the crime scene with similar materials taken from the sole of the bloody sneaker. The traces of blood on the sneaker were consistent with the victims' blood but could not be positively identified as theirs. An investigator from the Connecticut state forensic laboratory identified the bloody footprint as made by the Puma sneaker. Mr. Hasan's brother testified that Mr. Hasan had been in and out of the South Norwalk apartment between July 1 and July 3 and that the Puma sneakers were Mr. Hasan's because they were in his room under his bed. A former cellmate testified that Mr. Hasan had admitted taking part in the crime.

A podiatrist named Dr. Robert Rinaldi testified that the bloody sneaker showed signs of wear which matched the size and shape of Mr. Hasan's foot.

### B.     The Direct Appeal

On direct appeal, counsel for Mr. Hasan challenged the admissibility of the podiatrist's statement. On December 15, 1987, the Connecticut Supreme Court affirmed the admissibility of the expert testimony. Although there was no established "science of matching shoes to people," the podiatrist had sufficient experience in the field to permit him to compare Mr. Hasan's feet with the sneakers. *Id.* at 494. The court drew a parallel to the identification of skeletal remains, bite marks, and footprints through physical comparison rather than scientific test or experiment. The court concluded, "[w]e consider this case one in which the established techniques in [the expert's] uncontested area of expertise have been applied to the solution of a novel problem that is well within the capability of those techniques." *Id.*

2

### C. The First State Habeas Application

In 1986, Mr. Hasan filed his first state court application for a writ of habeas corpus. He filed the application *pro se*. Attorney Louis Avitabile was assigned to represent Mr. Hasan.

In his application, Mr. Hasan claimed ineffective assistance of trial counsel. The state trial judge denied the application following a three-day evidentiary hearing. *See Hasan v. Warden*, No. 86-0000326, 1991 WL 25770 (Conn. Super. Ct. Feb. 1, 1991). On the third day of the trial, Mr. Hasan's attorney raised for the first time a claim that trial counsel had been ineffective in failing to challenge the search warrant affidavit which led to the discovery and seizure of the bloody sneaker. The trial court denied a motion to amend the petition to include this claim. The decision denying the application was affirmed by the Connecticut Appellate Court. *See Hasan v. Warden*, 27 Conn. App. 794, *cert. denied*, 223 Conn. 917 (1992).

### D. The Second State Habeas Application

On June 29, 2005, Mr. Hasan filed a second application for writ of habeas corpus, *pro se*, in Connecticut Superior Court. The court assigned attorney Arnold Amore to represent him. The application presented claims that the warrant issued in violation of the Fourth Amendment and Article First of the Connecticut Constitution. It raised questions about the alleged lack of specific information in the affidavit submitted in support of the warrant and contended that the failure of his former attorneys to raise these issues at trial and in the first state habeas application violated his right to effective assistance of counsel.

Following a trial on the merits, the Superior Court denied the application for a writ of habeas corpus on September 15, 2008. The Connecticut Court of Appeals dismissed Mr. Hasan's appeal on October 19, 2010. *See Hasan v. Comm'r of Corr.*, 124 Conn. App. 906 (2010). The Connecticut Supreme Court denied certification for appeal on December 8, 2010. *See Hasan v. Comm'r of Corr.*, 299 Conn. 917 (2010).

### E. Procedural History of the Federal Petition

Mr. Hasan filed this § 2254 petition on April 5, 2011. The State filed a motion to dismiss on grounds of time-bar in April 2013. Counsel was appointed on Mr. Hasan's behalf in March 2014. Following a hearing on the motion, the court issued an order providing for an evidentiary hearing on Mr. Hasan's claim of equitable tolling. (Doc. 31.)

## II. Findings of Fact

In order to rule on the issue of equitable tolling, the court must make specific factual findings concerning the nature and duration of the attorney-client relationship between Mr. Hasan and Mr. Avitabile. The below findings are based on the evidentiary hearing conducted on February 17, 2016.

1. Following the filing of Mr. Hasan's first state habeas proceeding, attorney Louis Avitabile was appointed to represent him as a special public defender handling habeas petitions. Mr. Avitabile represented Mr. Hasan at the trial of the first habeas proceeding before Judge Dunn who rendered a decision in favor of the State on February 1, 1991. *See Hasan*, 1991 WL 25770, at *2–3. Mr. Avitabile continued to represent Mr. Hasan during his appeal of that decision to the Connecticut Appellate Court, which affirmed the decision of the trial court on June 16, 1992. *See Hasan*, 27 Conn. App. at 799. Mr. Avitabile then represented Mr. Hasan in an unsuccessful effort to persuade the Connecticut Supreme Court to accept an appeal from the Appellate Court. These efforts came to an end on September 17, 1992, when the Connecticut Supreme Court denied certification of the appeal. *See Hasan*, 223 Conn. at 917.

2. In the course of trial of the first state habeas case, Mr. Avitabile became aware of a potential claim that the affidavit supporting the search warrant was deficient and that the bloody sneaker may have been seized in an unconstitutional manner. Mr. Avitabile sought to include a new allegation of ineffective assistance of counsel based on trial counsel's failure to make this argument. The court denied this request to amend the petition. *See Hasan*, 27 Conn. App. at 797.

3. After exhausting all appeals in the first habeas case, Mr. Avitabile told Mr.

4

Hasan that he could not represent him any longer and that he should consider a federal habeas proceeding. Mr. Avitabile stated that he was not familiar with federal habeas representation and did not handle those cases. (Doc. 46 at 13–14, 17.)

4. Mr. Avitabile remained in contact with Mr. Hasan from 1992, when the first state habeas case ended, until at least 2002. The two men were on friendly terms. The attorney accepted Mr. Hasan's collect phone calls and would speak with him for up to five minutes. There were approximately six phone calls over a period of ten years. Mr. Hasan also sent occasional holiday cards. (*Id.* at 9–12, 14, 16.)

5. Mr. Avitabile is uncertain of when the phone calls came to an end. His best recollection is in 2002. It is possible that he received calls from Mr. Hasan after that date but he has no specific recollection. Later he became aware that Mr. Hasan had filed a second state habeas petition, and he may have learned this from Mr. Hasan over the telephone. (*Id.* at 10, 12, 16.)

6. Mr. Avitabile testified credibly that although he never sent Mr. Hasan a letter terminating his services or told him that he was no longer his attorney, he and Mr. Hasan both understood that his representation ended with the first state habeas proceeding. He testified as follows:

> Q: At any point during those telephone calls [with Mr. Hasan from prison], did you ever tell Mr. Hasan, "I don't represent you anymore."
>
> A: He knew I couldn't be representing him anymore but he was – he would still value my advice or he would talk to me about stuff, and I would talk to him, because I wished him well in his being able to eventually become successful in those habeases.
>
> Q: Do you ever specifically recall telling him that you do not represent him anymore?
>
> A: Well, he had other attorneys. He knew I didn't represent him. I mean, so whatever issues we discussed after but I always felt that he could call me and talk to me about anything he wanted.

5

> Q:   What do you mean by that that he could call –
>
> A:   In reference to his case. If he had any issues or anything he wanted to, you know, talk to me about his case.

(*Id.* at 11.) The court finds that Mr. Avitabile was credible in his description of how he continued to make himself available to Mr. Hasan on an informal basis to serve as a sounding board for Mr. Hasan about his continuing efforts to obtain his freedom. (*Id.* at 26–28, 35.)

7. Late in his career, Mr. Avitabile accumulated several bar reprimands for neglecting his work in civil matters. Mr. Avitabile had little recollection of the specific charges, and nothing more concrete was offered into evidence. The court heard this testimony over the objection of counsel for the State. The court later concluded that these reprimands were irrelevant and should not have been introduced. They form no part of the court's decision-making.

8. Mr. Hasan testified that after losing the final appeal in the first state habeas case, he understood that Mr. Avitabile intended to file another lawsuit on his behalf. Mr. Hasan testified that he called Mr. Avitabile two or three times per year from 1992 to 2002. In the period between 2001 and 2002, Mr. Hasan learned about the one-year limitations period for federal relief from a prison law clerk. At that point he felt what he described as "distance" from Mr. Avitabile. He turned towards drafting a second habeas petition himself, and filed the second state habeas petition in 2005 as a *pro se* litigant. (*Id.* at 39–43, 48–49, 52, 68–69.)

9. Mr. Hasan was not credible when he testified that he believed that Mr. Avitabile was working on a second lawsuit for him after the conclusion of the first Connecticut habeas case. Mr. Hasan has filed two habeas petitions on his own: the first immediately after the conclusion of the direct appeal of his conviction. Through his trial, appeal, and first state habeas petition, he had frequent contact with the legal system between 1985 and 1992 when his work with Mr. Avitabile came to an end. It is not probable that he believed for 10 years (1992-2002) that Mr. Avitabile was working on a second federal petition with nothing to show for it.

### III.  Analysis

This case is subject to the one-year limitations period established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2244(d)(1). The limitation period runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* at § 2244(d)(1)(A). Mr. Hasan's time to seek direct review expired ninety days after the 1987 Connecticut Supreme Court decision affirming his conviction – the time period in which he could have filed a petition for certiorari with the United States Supreme Court. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 653–54 (2012); *see also Toccaline v. Comm'r*, Prisoner No. 3:10-CV-1404 (JCH), 2012 WL 603294, at *5 (D. Conn. Feb. 23, 2012). However, because Mr. Hasan's judgment became final before AEDPA was enacted in 1996, his limitation period did not end until April 24, 1997, pursuant to a Second Circuit opinion granting the benefit of a one-year grace period for such petitioners to file their § 2254 petitions. *See Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998).

The State has moved to dismiss on limitations grounds because Mr. Hasan failed to file his petition within one year of the effective date of the AEDPA limitations period. Mr. Hasan responds that two distinct tolling periods excuse his delay. In his view, the doctrine of equitable tolling extended the time to file his federal petition from April 1997 until June 2005. Commencing June 29, 2005, he relies on the pendency of the second state habeas petition to provide a second tolling period.

The one-year time limit under AEDPA is statutorily tolled while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2). The first state habeas petition was filed in 1986 and remained pending until 1992 when the Connecticut Supreme Court refused to hear an appeal from the Appellate Court. That case precedes the enactment of AEDPA and is irrelevant to the tolling issue.

The second state habeas petition lasted from the filing date of June 29, 2005 until December 8, 2010. The parties agree that this period is properly excluded from the calculation of time limits under AEDPA. The only issue in dispute is whether there is a basis for tolling during the earlier period (April 1997 – June 2005). Mr. Hasan claims that during these years he

7

relied upon assurances from Mr. Avitabile that he was still working on Mr. Hasan's behalf and that Mr. Hasan's reliance upon him constitutes extraordinary circumstances sufficient to excuse his delay on grounds of equitable tolling.

The court denies Mr. Hasan's claim for equitable tolling for several reasons. Equitable tolling requires the petitioner to "establish that (a) extraordinary circumstances prevented him from filing a timely petition, and (b) he acted with reasonable diligence during the period for which he now seeks tolling." *Martinez v. Superintendent of E. Corr. Facility*, 806 F.3d 27, 31 (2d Cir. 2015) (internal quotation marks and citation omitted).

Mr. Hasan asserts that he is the victim of attorney abandonment which constitutes such extraordinary circumstances. The court has determined as a factual matter that no abandonment occurred. Mr. Avitabile remained available to Mr. Hasan as a lawyer, but he undertook no work for him and left him under no misimpression that he would be filing a federal petition. This case is very different from *Martinez* in which a lawyer accepted post-conviction representation and then filed nothing on behalf of his client. *Id.* at 29. Rather, Mr. Avitabile carried out the representation in state court to which he was assigned and told Mr. Hasan when that case was over that the next step was a federal petition which he was not equipped to handle.

Even if there was credible evidence that Mr. Hasan had reason to believe that Mr. Avitabile intended to file a second case for him, Mr. Hasan must "still demonstrate that he himself made reasonably diligent attempts to ensure that his petition was filed on time." *Doe v. Menefee*, 391 F.3d 147, 175 (2d Cir. 2004) (citation omitted). Courts consider the following factors when assessing reasonable diligence in the context of the AEDPA filing deadline: (1) "the purpose for which the petitioner retained the lawyer," (2) the client's "ability to evaluate the lawyer's performance," (3) the client's "financial and logistical ability to consult other lawyers or obtain new representation," and (4) the client's "ability to comprehend legal materials and file the petition on his own." *See id.* at 175. The court considers each factor in turn.

1. *The purpose for which the petitioner retained the lawyer*: Mr. Avitabile was appointed by the state superior court as a special public defender to represent Mr. Hasan in his first state habeas proceeding, filed in Rockville Superior Court. Mr. Avitabile's appointment was limited to the one case in which he represented Mr.

8

   Hasan through trial, an appeal, and a request for certification by the state supreme court.

2. *The client's ability to evaluate the lawyer's performance*: The two men were on friendly terms, and Mr. Hasan was able to reach Mr. Avitabile by phone whenever he wished. There is no evidence of any obstacle that prevented him from directly asking Mr. Avitabile when he might receive a copy of a petition. It is more likely that he never asked this question because he did not believe that Mr. Avitabile was filing a second case on his behalf.

3. *The client's financial and logistical ability to consult other lawyers or obtain new representation*: This factor favors Mr. Hasan. During the time period from 1992 until the running of the AEDPA time limit in April 1997, the record discloses no other access to legal advice or representation beyond Mr. Avitabile, who remained willing to accept Mr. Hasan's collect calls.

4. *The client's ability to comprehend legal materials and file the petition on his own*: Mr. Hasan filed a habeas petition on his own before Mr. Avitabile was appointed to represent him, and he did so again in 2005 after their relationship had ended. It is clear that Mr. Hasan underwent something of a crash course in criminal procedure following his conviction. By 1992, it is likely that he had a working knowledge of the habeas process.

Considered as a whole, these factors do not support a conclusion that Mr. Hasan acted with reasonable diligence between 1992 and 2002 in relying upon Mr. Avitabile to file a second petition on his behalf.

Finally, there is the question of the period of time between 2002 and the filing of the second state petition in 2005. Mr. Avitabile and Mr. Hasan agree that their relationship cooled and their contact came to an end in 2002. It is also undisputed that Mr. Hasan knew that Mr. Avitabile had not filed a second petition on his behalf by the end of 2002 at the latest, and that there was a one-year time limit to initiate such a proceeding. Yet, Mr. Hasan filed nothing

9

during the years 2003 and 2004, thereby placing a federal claim far beyond any possible period of equitable tolling.

## IV. Conclusion

For these reasons, the court GRANTS Respondent's Motion to Dismiss (Doc. 11).

Dated this 27th day of May, 2016.

/s/Geoffrey W. Crawford, USDJ
Geoffrey W. Crawford, Judge
United States District Court